# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **BETTY B. RANDOLPH,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06cv00058 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| Commissioner of Social Security, | ) | By:  PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I vacate the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

Plaintiff, Betty B. Randolph, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423. (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

-1-

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Randolph filed her application for DIB on or about January 17, 2004, alleging disability as of December 31, 2003, based on nerve problems, anxiety, depression, arthritis, hypertension, high cholesterol, diabetes mellitus, headaches and stress. (Record, ("R."), at 64A-64C, 66.) The claim was denied initially and upon reconsideration. (R. at 38-40, 43, 48-50.) Randolph then requested a hearing before an administrative law judge, ("ALJ"). (R. at 51.) The ALJ held a hearing on March 17, 2005.[1] (R. at 22-35.)

By decision dated January 17, 2006, the ALJ denied Randolph's claim. (R. at 13-21.) The ALJ found that Randolph met the disability insured status requirements of the Act for DIB purposes on the alleged onset date, and would continue to do so through December 31, 2008. (R. at 20.) The ALJ found that Randolph had not performed substantial gainful activity since December 31, 2003. (R. at 20.) The ALJ also found that the medical evidence established that Randolph suffered from severe impairments, namely diabetes mellitus, hypertension, depression and osteoarthritis,

---

[1]Randolph waived her right to a hearing by correspondence dated March 1, 2005. (R. at 238.) Thus, neither Randolph nor her attorney appeared for the hearing.

but she found that Randolph's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ also found that Randolph's allegations regarding her limitations were not totally credible. (R. at 20.) The ALJ found that Randolph retained the residual functional capacity to perform sedentary work[2] that allowed for mild reduction in concentration. (R. at 20.) The ALJ found that Randolph could perform her past relevant work as an administrative assistant. (R. at 20.) Thus, the ALJ found that Randolph was not disabled under the Act at any time through the date of the ALJ's decision, and was not eligible for DIB benefits. (R. at 20-21.) *See* 20 C.F.R. § 404.1520(f) (2006).

After the ALJ issued her decision, Randolph pursued her administrative appeals, (R. at 8), but the Appeals Council denied her request for review. (R. at 5-7.) Randolph then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2006). The case is before this court on the Commissioner's motion for summary judgment filed September 26, 2006.

## *II. Facts*

Randolph was born in 1942, (R. at 64A), which classifies her as a "person of

---

[2]Sedentary work involves lifting up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2006).

advanced age" under 20 C.F.R. § 404.1563(e). Randolph has a high school education and past work experience as an administrative assistant for a bank. (R. at 67, 72.)

Ann Marie Cash, a vocational expert, was present and testified at Randolph's hearing. (R. at 28-34.) Cash classified Randolph's work as an administrative assistant as sedentary, skilled work. (R. at 30.) Cash was asked to consider a hypothetical individual of Randolph's age, education, background and work experience, who had the residual functional capacity to perform sedentary work and who had a mild reduction in concentration due to anxiety and depression. (R. at 31.) Cash testified that such an individual could perform the job of an administrative assistant. (R. at 32.)

In rendering her decision, the ALJ reviewed records from Merit Medical Group; Dr. Clinton H. Sutherland, M.D.; Dr. Gary Craft, M.D.; Julie Jennings, Ph.D., a state agency psychologist; B. Wayne Lathorn, Ph.D., a licensed clinical psychologist; Dr. Arthur Nieto, M.D.; Dr. Robin Wood, M.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Donald R. Williams, M.D., a state agency physician; and R. J. Milan Jr., Ph.D., a state agency psychologist.

The record shows that Randolph was treated at Merit Medical Group from 1999 through 2002 for various complaints including hypertension, diabetes mellitus, anxiety disorder, osteoarthritis and depression. (R. at 124-38, 239-54.) In March 2000, Randolph complained of feeling nervous, anxious and panicky and was diagnosed with an anxiety disorder. (R. at 124.) She was prescribed Paxil. (R. at 124.)

-4-

In February 2002, Dr. Clinton H. Sutherland, M.D., saw Randolph for follow-up after a hospitalization. (R. at 143.) Dr. Sutherland diagnosed hypertension, noninsulin dependent diabetes mellitus, inflammatory bowel disease and depression. (R. at 143.) A bone mineral density study was performed in February 2002 that revealed no evidence of osteoporosis or osteopnia in Randolph's left hip, left forearm and lumbar spine. (R. at 146-47.) In April 2002, Dr. Sutherland opined that Randolph should exercise daily in the form of a two-mile walk. (R. at 142.) In June 2002, Randolph was diagnosed with acute bronchitis, but chest x-rays did not show any demonstrable abnormality. (R. at 141, 145.) In December 2002, Dr. Sutherland noted that Randolph could follow-up in four-month intervals. (R. at 139.) In April 2003, Dr. Sutherland's examination revealed some tenderness over Randolph's finger joints, (R. at 159), but an x-ray showed no demonstrable pathology. (R. at 144.) In August 2003, Randolph reported that she had been doing very well except for an increased cholesterol level due to having discontinued Lipitor while on vacation. (R. at 158.) In December 2003, Randolph complained that she was under a lot of stress and had been feeling depressed and anxious and "always under pressure." (R. at 157.) Dr. Sutherland noted that Randolph's affect was blunt and that she was tearful and crying. (R. at 157.) Dr. Sutherland diagnosed major depression. (R. at 157.) Dr. Sutherland recommended that Randolph stay out of work beginning in January 2004. (R. at 157.)

In February 2004, Dr. Sutherland wrote a note stating that he recommended that Randolph stop work due to "constellation of symptoms suggesting major depression." (R. at 160.) Randolph requested that Dr. Sutherland delay removing her from work until a suitable substitute could be found. (R. at 160.) In a follow-up note, there is no reference to depression by either Randolph or Dr. Sutherland. (R. at 257.)

On March 16, 2004, Dr. Gary Craft, M.D., examined Randolph at the request of Disability Determination Services. (R. at 161-66.) Randolph complained of pain and stiffness in her hips, fingers and legs. (R. at 161.) She reported that her hypertension and diabetes were under control. (R. at 161.) Dr. Craft reported that Randolph was fully ambulatory without any acute distress, she had full range of motion of her neck, her grip and strength and fine manipulation were intact, her motor power in each arm was normal, her sensation to pinprick was intact and there was no muscle atrophy in either arm. (R. at 162.) Dr. Craft reported that Randolph's ability to walk and squat were normal, as well as her station and gait. (R. at 162-63.) Straight leg raising tests were negative, and Randolph's motor power in each leg was normal. (R. at 163.) Dr. Craft reported that despite Randolph's complaints of severe pain, she was free of any objective pathology related to her joint system. (R. at 163.) Randolph had full range of motion of all joints. (R. at 163.) X-rays of Randolph's hands and hips were normal. (R. at 163.) Randolph had no diabetic neuropathy, peripheral neuropathy or evidence of a major impairment in her vision. (R. at 163.) She was well-oriented, related well and was free of any psychiatric behavior and her gross mental status was intact. (R. at 163.) Dr. Craft opined that Randolph would have some limitations secondary to her joint complaints. (R. at 163.) He opined that Randolph could frequently lift and carry items weighing up to 10 pounds and occasionally lift and carry items weighing up to 20 pounds and that she could sit, stand and/or walk for two hours in an eight-hour workday. (R. at 163.)

On March 25, 2004, Julie Jennings, Ph.D., a state agency psychologist, indicated that Randolph suffered from an affective disorder. (R. at 167-82.) Jennings indicated that Randolph had moderate limitations in her ability to perform activities

-6-

of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 177.) Jennings found that there was insufficient evidence to determine if Randolph had experienced any episodes of decompensation. (R. at 177.)

Jennings also completed a mental assessment, indicating that Randolph was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers, to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others. (R. at 183-86.) Jennings reported that Randolph would be capable of simple, unskilled, nonstressful work. (R. at 185.)

On March 25, 2004, Dr. Frank M. Johnson, M.D., a state agency physician, indicated that Randolph had the residual functional capacity to perform medium work.[3] (R. at 187-95.) Dr. Johnson indicated that Randolph could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but never climb ladders,

---

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2006).

-7-

ropes or scaffolds. (R. at 190.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 190-92.)

On June 1, 2004, Dr. Donald R. Williams, M.D., a state agency physician, indicated that Randolph had the residual functional capacity to perform medium work. (R. at 196-203.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 198-200.)

On June 1, 2004, R. J. Milan Jr., Ph.D., a state agency psychologist, indicated that Randolph suffered from a nonsevere affective disorder. (R. at 204-19.) Milan indicated that Randolph had no restriction of activities of daily living. (R. at 214.) He indicated that Randolph had mild limitations in her ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 214.) He also indicated that Randolph had not experienced any episodes of decompensation. (R. at 214.)

On October 18, 2004, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Randolph at the request of Randolph's attorney. (R. at 220-29.) The Wechsler Adult Intelligence Scale-III, ("WAIS-III"), test was administered, and Randolph obtained a verbal IQ score of 88, a performance IQ score of 83 and a full-scale IQ score of 85. (R. at 221.) Randolph reported that she did not take any psychotropic medication. (R. at 222.) Randolph reported depression, (R. at 224), and panic attacks. (R. at 224.) Lanthorn diagnosed major depressive disorder, recurrent, severe and panic disorder without agoraphobia. (R. at 228.) He indicated that Randolph had a then-current Global Assessment of Functioning, ("GAF"), score of

50.[4] (R. at 228.)

Lanthorn also completed a mental assessment, indicating that Randolph had a more than satisfactory ability to maintain personal appearance. (R. at 230.) He indicated that Randolph was limited, but satisfactory, in her ability to understand, remember and carry out simple job instructions. (R. at 230.) Lanthorn found that Randolph had a seriously limited, but not precluded, ability to follow work rules, to relate to co-workers, to use judgment, to interact with supervisors, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 230.) He also found that Randolph had no useful ability to deal with the public, to deal with work stresses, to understand, remember and carry out complex job instructions and to demonstrate reliability. (R. at 230.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe

---

[4]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 17, 2006, the ALJ denied Randolph's claim. (R. at 13-21.) The ALJ found that the medical evidence established that Randolph suffered from severe impairments, namely diabetes mellitus, hypertension, depression and osteoarthritis, but she found that Randolph's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ found that Randolph retained the residual functional capacity to perform sedentary work that allowed for mild reduction in concentration. (R. at 20.) The ALJ found that Randolph could perform her past relevant work as an administrative assistant. (R. at 20.) Thus, the ALJ found that Randolph was not

disabled under the Act at any time through the date of the ALJ's decision, and was not eligible for DIB benefits. (R. at 20-21.) *See* 20 C.F.R. § 404.1520(f) (2006).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if she sufficiently explains her rationale and if the record supports her findings.

Randolph argues that the ALJ erred by finding that she did not meet the listing for depressive disorder, § 12.04, and anxiety disorder, § 12.06. (Brief In Support Of

Plaintiff's Motion For Summary Judgment,[5] ("Plaintiff's Brief"), at 7-10.) Randolph further argues that the ALJ erred in her determination of Randolph's mental residual functional capacity. (Plaintiff's Brief at 10.) Randolph also argues that the ALJ erred by failing to elicit testimony from a psychological expert at her hearing. (Plaintiff's Brief at 10-11.) Randolph does not contest the ALJ's finding with regard to her physical residual functional capacity.

Based on my review of the record, I reject Randolph's argument that the ALJ erred by finding that her depression did not meet or equal a listed impairment. (Plaintiff's Brief 7-10.) The qualifying criteria for the listed impairment for depression is found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04. To meet the requirements of this section, a claimant must show that she suffers from at least four of the listed symptoms of depressive syndrome, which result in at least two of the following:

1. Marked restriction of activities of daily living;
2. Marked difficulties in maintaining social functioning;
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(A)(1), 12.04(B) (2006). A claimant also may meet the requirements of this section if she has a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than minimal limitation of ability to do basic work activities. *See* 20 C.F.R. Pt.

---

[5]Randolph did not file a motion for summary judgment in this case.

404, Subpt. P., App. 1, § 12.04(C) (2006).

While Lanthorn opined that Randolph suffered from major depression, the ALJ gave little weight to this assessment because it was not supported by Lanthorn's own clinical findings, the objective evidence of record or the opinion of the reviewing psychologist at the reconsideration level. (R. at 19.) The ALJ also noted that the record did not contain any other objective evidence to support the diagnosis of depressive or anxiety disorder, and that Randolph had never sought ongoing treatment by a mental health professional. (R. at 19.) There is no indication in the record that Randolph suffered from more than moderate limitations in her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace (R. at 177.) Based on this, I find that substantial evidence exists to support the ALJ's finding that Randolph did not meet or equal § 12.04.

I also reject Brown's argument that the ALJ erred by finding that her anxiety did not meet or equal the listed impairment for anxiety related disorders found at § 12.06. To meet § 12.06, a claimant must show by medically documented findings that she suffers from at least one of the following:

> 1. Generalized persistent anxiety accompanied by three of the following: motor tension, autonomic hyperactivity, apprehensive expectation or vigilance and scanning;
> 2. A persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity or situation;
> 3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear,

-13-

>                    terror and sense of impending doom occurring on the
>                    average of at least once a week;
>           4.       Recurrent obsessions or compulsions which are a
>                    source of marked distress; or
>           5.       Recurrent and intrusive recollections of a traumatic
>                    experience, which are a source of marked distress.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(A) (2006). A claimant also must show that her condition results in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked deficiencies of concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(B) (2006). If a claimant cannot show that her condition resulted in two of the previous problems, she still may qualify for benefits under this section if she can show that her symptoms have resulted in a complete inability to function independently outside the area of her home. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(C) (2006). Based on my review, I find that the record contains no evidence from any psychological or psychiatric expert stating that Randolph's anxiety met these criteria. Therefore, I find that substantial evidence supports the ALJ's finding that Randolph's condition did not meet or equal the requirements of § 12.06.

I do not find, however, that substantial evidence exists to support the ALJ's finding that Randolph retained the residual functional capacity to perform sedentary work that allowed for only a mild reduction in concentration. In 2004, state agency psychologist Jennings found that Randolph suffered from an affective disorder that caused moderate limitations in Randolph's ability to perform activities of daily living, to maintain social functioning and to maintain concentration, persistence or pace. (R. at 177.) Furthermore, Jennings found that Randolph was moderately limited in a

number of work-related activities that were consistent with the findings of Lanthorn. (R. at 183-85.) Jennings concluded that Randolph was capable of performing simple, unskilled, nonstressful work. (R. at 185.) The ALJ found that Randolph could perform sedentary work that allowed for a mild reduction in concentration. (R. at 20.) Furthermore, the ALJ failed to mention Jennings's assessment in her opinion.

While the ALJ is not bound to accept a medical source's opinion as to a claimant's residual functional capacity, she must consider any such opinion and explain what, if any, weight was given to it or why she chose to reject it. *See* 20 C.F.R. § 404.1527 (2006); *see also King*, 615 F.2d at 1020. In this case, the ALJ offers no explanation of her weighing of the medical evidence on this issue. Thus, I cannot find that substantial evidence exists in the record to support the ALJ's finding that Randolph had the residual functional capacity to perform sedentary work subject only to a mild reduction in concentration.

## *IV. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated and this case will be remanded to the Commissioner for further development.

An appropriate order will be entered.

DATED: This 11th day of January 2007.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE